**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SUSAN MANUS,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Case No. 18 – 1146 (KBJ)** |
| **CARLA HAYDEN,** <br> **Librarian,** <br> **U.S. LIBRARY OF CONGRESS,** | : | |
| **Defendant.** | : | |

## STATEMENT OF MATERIAL FACTS IN DISPUTE[1]

Plaintiff, Susan Manus, has established that there are material facts in dispute with regard to the Agency, Library of Congress's unlawful treatment of her in violation of Title VII and 29 U.S.C. §623. Summary judgment is only appropriate when no genuine issue of material fact exists and the moving party has proven its burden of demonstrating the absence of any genuine issue of material facts. It is clear by the Defendant's Statement of Undisputed Material Facts that a number of the "undisputed" facts are indeed, disputed. Additionally, numerous material facts were omitted, demonstrating that issues of material fact exist. As set forth herein, the following material facts are in dispute, which establish that Defendant is not entitled to Judgment as a matter of law.

1. Plaintiff Susan Manus ("Plaintiff") began her career with the Library of Congress as a library technician in the Music Division. Manus Deposition Transcript Excerpt, DEX 1, p. 12:1-10.

   **Response:** Admit.

2. In approximately 2015, Plaintiff became the coordinator of communication strategy in the

[1] This statement addresses Defendant's Statement of Undisputed Material Facts. The paragraph numbers with correlate with the paragraph numbers contained in Defendant's Statement.

National and International Outreach ("NIO") service unit. DEX 1, pp. 9:5-6; 12:11-16, 12:25-13:8; 25:6-12.

**Response:** Admit.

3. In this position, Plaintiff initially worked for Colleen Shogan for a year. DEX 1, pp. 12:11-16; 12:25-13-18.

**Response:** Admit.

4. She later was supervised by Ellis Brachman. DEX 1, pp. 113:9-22; 14:7-11.

**Response:** Admit.

5. Mr. Brachman assumed that supervisory role on September 18, 2016. DEX 3, at LIB000962.

**Response:** Admit.

6. Plaintiff's office was given to Mr. Brachman upon his arrival. DEX 1, p. 18:14-21.

**Response:** Admit..

7. Plaintiff was Mr. Brachman's only direct report. Brachman Deposition Transcript Excerpt, DEX 4, at pp. 110-15-22.

**Response:** Admit.

8. Mike Aschfelder was detailed to Mr. Brachman's shop for a stint to examine podcasting for the Library. DEX 4, at pp. 110:22-111:19.

**Response:** Admit.

9. Michelle Spezzacatana also did a 30-day Leadership Development Program detail for Mr. Brachman's shop, during which she assisted with planning and executing a conference and supporting NIO communication operations. DEX 4, at pp. 111:21-113:3.

**Response:** Admit.

10. The operations office converted a closet in the publishing office, which was on the other side of the building, into an office for Ms. Spezzacatana. DEX 4, at pp. 111:21-113:21

**Response:** Admit.

11. After Mr. Brachman's arrival, Plaintiff's role became focused on internal publications. DEX 1, pp. 14:12-14; 15:1-6; 15:11-21.

**Response:** Deny, Brachman pushed her out of marketing. Ex. A. at 35.

12. Plaintiff was responsible for the weekly and monthly newsletters for the NIO staff. DEX 1, pp. 15:11-16:5.

**Response:** Admit.

13. For the weekly newsletter, Plaintiff gathered timely news items and assisted with the distribution of it to the NIO staff on a weekly basis. DEX 1, p.16:6-12.

**Response:** Admit.

14. Plaintiff turned in drafts of the weekly newsletter to Mr. Brachman the day before the publication deadline. DEX 1, p. 16:12-13; 16:23-17:4.

**Response:** Admit.

15. For the monthly newsletter, Plaintiff was required to do more writing because it included feature stories, lists of timely news items, and staff news, including any NIO staff changes. DEX 1, p. 17:5-14.

**Response:** Admit, however, "more" writing than what is not defined.

16. On January 8, 2017, Ms. Manus received a pay increase which raised her salary from $134,296. Manus SF-50, DEX 6, LIB000101.

**Response:** Admit.

17. In a January 31, 2017, email time stamped 10:52 a.m., M. Brachman emailed Plaintiff "to talk about news blurbs moving forward [as he was] pretty disappointed with the content" of Plaintiff's draft of the February monthly newsletter. In relevant part, he indicated that several of the blurbs were "pulled verbatim form other material – including references to dates (today, this week, etc) which are no longer true. And no attempt to present the news most interesting for NIO. We are trying to differentiate between the weekly and the monthly – just including the same text in both does not help with that at all." He further noted that

they "need[ed] to do a better job of pro-actively catching new news blurbs." DEX 7, at LIB000517.

**Response:** Admit.

18. In a February 1, 2017, email time stamped 9:23 a.m., Colleen Shogan, Plaintiff's second level supervisor noted that Mr. Brachman had "started document[ing] [Plaintiff's] work when it does not meet fully successful standards. DEX 7, at LIB000517; DEX 4, p. 18:1- 4.

**Response:** Admit.

19. In a February 2, 2017, email time stamped 2:43 p.m., Mr. Brachman pointed out to Plaintiff that one of the details listed in her draft of the weekly newsletter had closed. DEX 8, at LIB000531.

**Response:** Admit.

20. Plaintiff sent the draft approximately 20 minutes prior to Mr. Brachman's email. Id.

**Response:** Admit.

21. In a February 23, 2017, email at 5:07 p.m., Mr. Brachman reminded Plaintiff of a conversation they had earlier that day and asked that review the March monthly newsletter she submitted at 3:41 p.m. for typographical errors, places where she could tell the story better, and stronger headlines. He also reminded her that he did not want to use items verbatim from the weekly newsletters. DEX 9, at LIB000539.

**Response:** Admit.

22. On March 31, 2017, at 3:48 p.m., Mr. Brachman emailed Tabatha Irving to determine when Ms. Manus was due for her next within grade increase ("WIG"). Ms. Irving informed him that Ms. Manus's next increase was due in April 2018. DEX 10, at LIB000520.

**Response:** Admit.

23. On March 31, 2017, Mr. Brachman issued Plaintiff her annual performance rating for the March 2, 2016 to March 1, 2017, rating period. DEX 4, at p. 125:1-12; DEX 2K, Manus Deposition Exhibit No. 13, at 000026; DEX 11, at LIB000569.

**Response:** Admit.

24. Plaintiff received a "successful" rating out of the five possible ratings of "outstanding," "commendable," "successful," "minimally successful" and "unsatisfactory." DEX 2K, at 000026.

**Response:** Admit.

25. In the narrative summary part under the section entitled "Major Area of Responsibility" Development & Leadership of Strategic Communications Initiatives," Mr. Brachman noted in relevant part:

> Ms. Manus spent a majority of this performance period on detail as Co-Director of the 2016 National Book Festival. In that capacity, she ensured the success of a major Library Initiative, including serving on the contract review team, coordinating planning and volunteers across Library division and with outside partners, and supporting the creation of a podcast series and other marketing material. While out of the scope of this [Major Area of Responsibility], her work to help produce what has been called "the best" book festival in the Library's history is noted and reflected in her evaluation.
>
> . . .
>
> [I]t must be noted that Ms. Manus (sic) work product does not consistently meet expectations for a GS-14 communications professional. At this grade level, a communications coordinator is expected to work largely independently with minimal guidance to develop new initiatives, recommend strategies for solving problems and implement such solutions. Furthermore, the employee should be trusted to plan, schedule, and carry out major projects and initiatives. Products should normally be accepted "without significant change." Unfortunately, those standards are not consistently met at this time.

*Id.* at 000028.

**Response:** Admit.

26. Under the section entitled "Major Area of Responsibility: Marketing Strategy and Development," Mr. Brachman noted that "her work in this [area] ha[d] been limited, with little innovation or independent engagement to improve NIO and [Library of Congress] identification and recognition either internally or externally." Id.

**Response:** Admit.

27. For the previous rating period of March 1, 2015 through February 29, 2016, Plaintiff

received a performance rating of "satisfactory," out of the four possible ratings that "outstanding," "excellent," "satisfactory," and "unsatisfactory." DEX 2J, Manus Deposition Exhibit No. 12, at LIB000018.

**Response:** Admit.

28. In the comments section, her then supervisor Colleen Shogan noted in relevant part

> At this grade level, a communications coordinator must develop new initiative, recommend strategies for solving problems, and implement such solutions. Furthermore, the employee should be delegated authority to plan, schedule and carry out major projects and initiatives. Projects should normally be accepted "without significant change."

*Id.* at LIB000019.

**Response:** Admit, however, no specific directions were given.

29. For the March 1, 2014 to February 28, 2015, rating period, Plaintiff received a "satisfactory" rating from her then supervisor George Colburne. DEX 2I, Manus Deposition Exhibit No. 11, at LIB000062. There were only four possible ratings that year including "outstanding," "excellent," "successful," and "unsatisfactory." *Id.*

**Response:** Admit.

30. In the comments section of the performance rating, Coulbourne noted in relevant part that:

> The work you have done on producing executive summaries, short articles and press releases has required reworking and requiring several drafts, but again I attribute that to the "newness" of the programs to you. Recently you have demonstrated improvement…

*Id.* at LIB000063.

**Response:** Admit.

31. In an April 25, 2017, email at 5:51 p.m., Mr. Brachman informed Ms. Manus that the draft article she had penned for the monthly newsletter was disjointed and asked her to "streamline it to tell a coherent story instead of jumping from office to office?" DEX 12, at LIB000801.

**Response:** Admit.

32. In an April 27, 2017, at 8:46 a.m., Plaintiff wrote that she "connected the sections more"; however, as Mr. Brachman explained in his May 3, 2017, response, he had to spend a lot of time editing the piece, so that it could be posted. DEX 13, at LIB000809.

**Response:** Admit, however these were his subjective evaluations.

33. On May 11, 2017, at 7:21 p.m., Mr. Brachman informed Ms. Manus that the draft she submitted for the weekly newsletter was unacceptable. He noted problems with all three items she included, including that the first was not appropriate for all staff and the third was just repeated from the previous week. DEX 14, at LIB000636.

**Response:** Admit, however these were his subjective evaluations.

34. In the summer of 2017, Mr. Brachman reached out to Kym Tran in the Library's Human Resources Office about his concerns regarding Ms. Manus's performance. DEX 4, pp. 66:7-67:14.

**Response:** Admit. However, he did so without informing Manus. Ex. A. at 55.

35. On June 6, 2017, Mr. Brachman provided Ms. Tran with an article that Ms. Manus prepared, but that he had to edit. DEX 15, at LIB000713.

**Response:** Admit, however, his need to edit was his subjective evaluation.

36. In a July 5, 2017, email time stamped 6:16 p.m., he informed Ms. Tran that he had to rewrite Ms. Manus's work the night before and asked whether there was "enough red to be a problem for a GS-14." DEX 16, at LIB000705.

**Response:** Admit

37. On July 12, 2017, Mr. Brachman and Ms. Tran met to further discuss what Ms. Manus's work required and the tasks Mr. Brachman wanted her to perform. DEX 17, at LIB000716.

**Response:** Admit. He did so without informing Manus.

38. On July 14, 2017, Ms. Tran provided Mr. Brachman with a performance counseling memorandum for his review. DEX 18, at LIB000722.

**Response:** Admit. However, they did so without informing Manus.

39. On September 7, 2017, at 1:05 p.m., Mr. Brachman reached out to Lee Ann Potter, the head of Education Outreach, to see if Plaintiff had contacted her about a possible detail or job. DEX 19, at LIB000455; DEX 4, at pp. 97:11-98:7.

**Response:** Admit.

40. On September 7, 2017, at 5:27 p.m., Ms. Tran followed up to ask if Mr. Brachman had"any ideas for the performance counseling or if [he wanted] to try to hammer one out." DEX 20, at LIB000721.

**Response:** Admit. However, they did so without informing Manus.

41. That same day at 5:28 p.m, Mr. Brachman responded by asking Ms. Kim if the performance counseling memo was "still the right approach given that [Ms. Manus's] mid-year review [was] due in the next few weeks." *Id.*

**Response:** Admit. However, they did so without informing Manus.

42. Ms. Tran responded by email on September 7, 2017, at 5:34 p.m., "Absolutely! Her performance is far below successful, so you're actually doing her a favor; (1) you're telling/warning her she's in danger of being rated unsuccessful, and (2) you're giving her an opportunity to improve & turn the ship around." Id.

**Response:** Admit. However, they did so without informing Manus.

43. On September 12, 2017, Mr. Brachman met with Plaintiff to provide her mid-year review. DEX 4, Brachman Deposition Transcript Excerpt pp. 126:1-7; DEX 21, at LIB000888.

**Response:** Admit

44. Later, that same day at 3:32 p.m., he provided her with a Performance Counseling Memorandum to document their discussion. DEX 2L, Manus Deposition Exhibit No. 14, at LIB000001; DEX 22, at LIB000901.

**Response:** Admit.

45. In that Memorandum, Mr. Brachman noted in relevant part that he was "placing [Plaintiff] under performance counseling over the next 35 days calendar days to meet [her] established performance requirements" in two of her three Major Areas of Responsibility listed in her performance plan. DEX 2L, Manus Deposition Exhibit No. 14, at LIB000001-03; LIB000007-12.

**Response:** Admit.

46. In that Memorandum, Mr. Brachman further set forth the tasks Plaintiff was required to perform in that timeframe. With respect to her Major Area of Responsibility for the Development of Strategic Communication Initiatives, Plaintiff was tasked with ghostwriting the NIO Deputy Director's blog post for the October monthly newsletter, writing two feature articles for the October monthly newsletter and two feature articles for the November monthly newsletter. Id. at LIB000003.

**Response:** Admit.

47. As for her Major Area of Responsibility for Marketing and Development, Plaintiff was tasked with crafting a marketing plan for the Young Readers Center. Id. at LIB000004.

**Response:** Admit.

48. Mr. Brachman also explained the reasons the performance counseling was necessary in these two areas of responsibility. Id. at LIB00002-04.

**Response:** Admit, however these were his subjective evaluations.

49. With respect to Plaintiff's responsibility for the Development of Strategic Communication Initiatives, Mr. Brachman explained that Plaintiff's

> written products ...routinely require[d] extensive editing for both substance and format are not commensurate for GS-14-level. It ha[d] been necessary for [him] to fundamentally rewrite every NIO News top story that [she had] written, and [they had] reached the point where the monthly NIO News, which [was] one of [Plaintiff's] primary work responsibilities, include[d] almost no material written by [Plaintiff. The problems were] not small grammatical or formatting errors. In one article, [Plaintiff's] first sentence implied that most of the Library [was] not busy or focused on serving our customers...

> [Plaintiff did] not appear [to make] more than token efforts to complete [her] regular work responsibilities. The news items that [she] move[d] forward the weekly NIO Updates and the monthly NIO News …incorporated little to no analysis or complexity. Nearly all the material … repeated verbatim from other sources (often failing to even modify dates or headlines), or raw material submitted by others without even basic editing. [Mr. Brachman] had to rewrite, refocus, or outright reject nearly every item to ensure that [the] communications convey[ed] …organizational priorities and contributions. [Mr. Brachman] …also spent an inordinate amount of time fact-checking [Plaintiff's] work and inspecting links and formatting due to [Plaintiff's] persistent pattern of inattention to detail and repeated failure to proof [her] own work. In fact, [Mr. Brachman was] forced to address confusion from NIO because of an event link that [Plaintiff] incorrectly included in the weekly update recently.
>
> Moreover, the quantity of the work [Plaintiff produced was] far below the level commensurate of that of a GS-14. [Plaintiff's] regular recurring tasks, including the weekly NIO update; the material for the Monthly NIO News, including one or two one-page articles, the compilation of information from other sources, and a few briefs; and routine upkeep of the NIOsphere intranet … require[d] no more than 3 weeks' work from a GS-14. However, [Plaintiff] …expressed concerns with [Plaintiff's] workload and even on occasion requested credit hours to complete routine tasks, and still the work [Plaintiff] submit[ted] lack[ed] depth, clarity, and precision and required rewrites by [Mr. Brachman].

*Id.* at LIB000002.

**Response:** Admit, however these were his subjective evaluations.

50. As for Plaintiff's responsibility for Marketing Strategy and Development, Mr. Brachman explained

> [g]iven the inordinate amount of time that ha[d] been required to address [Plaintiff's] work under [Development of Strategic Communication Initiatives area of responsibility], [Mr. Brachman] ha[d] not been able to entrust [her] with assignments under this [area of responsibility], but that [did] not absolve [her] of the responsibility to proactively seek out opportunities to improve [the communication office's] ability to successfully market the work under [this area of responsibility]. [Plaintiff had] not provided any recommendations or guidance in the areas of developing NIO' marketing strategy nor [had Plaintiff] identified any opportunities or initiatives to contribute toward further development and outreach for NIO or Library programs. Furthermore, [Plaintiff had] not been engaged with NIO program offices to identify and implement improvements in [their] digital resources and marketing and outreach material.

*Id.*at LIB000004.

**Response:** Admit, however these were his subjective evaluations.

51. On September 22, Ms. Manus notified Mr. Brachman of her intention to retire effective September 30, 2017. DEX 23, at LIB000351.

**Response:** Admit

52. Ms. Manus retired from the Library on September 30, 2017. DEX 1, p. 9:5-6.

**Response:** Admit

53. As of September 30, 2017, Plaintiff's salary was $138,160. DEX 24, at LIB000095.

**Response:** Admit

54. Upon Ms. Manus's retirement, Mr. Brachman brought in Bailey Cahill to do a part-time, 20 hour a week detail to cover the portion of the work Ms. Manus had been performing. DEX 4, pp. 116:7-117:17; 123:81-24.

**Response:** Admit

55. Ms. Cahill was selected because she worked in one of NIO's subdivision and was underutilized. DEX 4, pp. 118:16-119:4.

**Response:** Deny. The reasons for the hiring of Cahill are phrased as subjective.

56. Ms. Cahill, like Ms. Manus, performed the duties on the low end of the position, which included the weekly newsletter and the monthly newsletter. DEX 4, pp. 123:9-124:4 .

**Response:** Deny, "lower end of duties" is phrased as subjective

Mr. Brachman's Contact with the Office of Equal Employment and Diversity Program

57. In April 2017, Mr. Brachman was contacted by Vicki Magnus, the Chief of the Office of Equal Employment Opportunity and Diversity Program regarding a consultationDEX 4,p. 105:5-22; DEX 5, Vicki Magnus Deposition Transcript, p. 16:6-13; 55:5-9; LIB00365.

**Response:** Admit

58. Ms. Magnus's Office had three primary areas of responsibility: (i) processing EEO

complaints; (ii) alternative dispute resolution; and (ii) providing consultation services for employees who want to talk without filing a complaint or dispute. DEX 5, pp. 17:15-19:1. Those consultation services included facilitating discussions an employee might like to have. DEX 5, pp. 18:16-19:1.

**Response:** Admit, but deny as to suggestion that "facilitating discussions" were the main services offered.

59. Ms. Magnus explained to Mr. Brachman that she had met with Ms. Manus who was interested in a detail. She informed Mr. Brachman that Ms. Manus had not filed an EEO complaint, grievance or alternative dispute resolution request. Ms. Magnus further explained that Ms. Manus was simply taking advantage of the services offered by Ms. Magnus's office for a facilitated conversation so that Ms. Manus could obtain a detail in the Music Division. DEX 5, pp. 50:13-53:10; DEX 4, pp. 105:5-107:22.

**Response:** Admit as to meeting with Manus but deny that Manus only sought a detail. Soon after the berating email from Brachman in May, 2017, I met with Magnus again and told her that my concerns were increasing about my supervisor due to this latest issue. I followed this up with an email about the same, begging for a solution and reassignment." *See* Ex F.

**Response:** Admit.

60. Mr. Brachman indicated that his division would be supportive of the detail as long as it was reimbursable. DEX 5, pp. 53:1-14; DEX 4, pp. 105:5-107:22.

**Response:** Admit as to Brachman initially supporting detail but later Brachman failed to assist in obtaining one. *See* Ex. C, page 97-98.

61. When Ms. Manus indicated she thought there was a possible detail in the Education Outreach in NIO, Ms. Magnus reached out to Mr. Brachman about that detail opportunity. DEX 5, pp. 82:8-19; 83:13-15; 84:5-85:11.

**Response:** Admit

62. Mr. Brachman did not think such a detail existed. DEX 5, pp. 85:6-11; 85:21-86-4.

**Response:** Admit

63. Ms. Magnus then called the supervisor in Education Outreach about the detail. Magnus Deposition Transcript Excerpt, pp. 86:10-22-88:10; 89:5-8; 93:20-94:15. That supervisor responded that there were no detail opportunities in Education Outreach. DEX 5, pp. 94:3-15.

**Response:** Admit but Brachman made no effort to start a negotiation of a possible detail.*See* Ex. C, page 97-98.

Plaintiff's Attempts to Obtain A Detail

64. Prior to Mr. Brachman's arrival, Plaintiff received notice from general management that she had to vacate the office she had occupied for six months. DEX 1, p. 18:14-19:1; DEX 25, at LIB000392.

**Response:** Admit

65. In a September 2, 2016, email, time stamped 10:29 a.m., Plaintiff wrote to Carol Ward-Bamford, her former co-worker in the Music Division:

> Well, yet another insult from NIO – I am being booted out of my office and back to a cubicle. Making room for another manager, I guess.
>
> So Sue [Vita, the head of the music division] will be back next week? Let me know if you need any more info. from me before you talk to her. Maybe a short term, renewable detail is one way to do this—as long as it would end up as long-term somehow.

DEX 2A, Manus Deposition Exhibit No. 2 at LIB0000392; DEX 1, pp. 20:10-21:15; 22:13- 15.

**Response:** Admit

66. Plaintiff felt that it was yet another insult because she had not been interviewed for the supervisory position that later went to Mr. Brachman. DEX 1, pp. 19:11-25; 20:10-21:11.

67. The detail Plaintiff referenced in this September 2, 2016, email was in the Music Division. DEX 1, pp. 29:25-30:10: 301:10-12.

**Response:** Admit

68. To secure the detail, Plaintiff needed the approval of the Music Division, particularly Sue Vita, the Chief of the Music Division, and NIO. DEX 1, pp. 31:13-19.

**Response:** Admit

69. In a September 7, 2016, email time stamped 9:22 a.m., Plaintiff wrote to Neonila Iwaskiw:

> I'd like to grab coffee at some point and see what you know about the options for a job detail (to another service unit)." DEX 26, at LIB000390.

**Response:** Admit

70. In a document with the subject line "detail" and a start date of September 7, 2016, Plaintiff recorded her "[n]otes for creating detail position in Music Division." DEX 27, LIB000391.

**Response:** Admit

71. In a document with the subject line "saul" and a start date of September 12, 2016, Plaintiff wrote:

> How best to switch service units?
> Detail – how long, what process?
> Goal is long term, til retirement!
> Since I'm not covered by the union, does that affect any Detail?

DEX 3, at LIB000389.

**Response:** Admit

72. In a September 27, 2016, email time stamped 4:08 p.m., Plaintiff wrote to Carol Ward-

Bamford:

> Now that book festival is over, onward and upward! Any news on my potential detail?

DEX 29, at LIB000386.

**Response:** Admit

73. At the time Plaintiff sent this email, Plaintiff was detailed on a part-time basis to the National Book Festival. DEX 1, pp. 25:6-12; 29:25-30:7.

**Response:** Admit

74. Plaintiff's office was given to Mr. Brachman upon his arrival. DEX 1, p. 18:14-21.

**Response:** Admit

75. In an email dated October 3, 2016 at 12:11 p.m., Ms. Ward-Bamford wrote to Ms. Vita about a possible detail for Ms. Manus and attached a detail proposal from Ms. Manus. At 12:18 p.m., Ms. Vita replied in part, "not sure this doesn't look redundant to your duties." DEX 30, at LIB000358.

**Response:** Admit

76. In an October 18, 2016, email time stamped 2:47 p.m., Plaintiff wrote the following to Ms. Ward-Bamford:

> Well that was interesting - I'm glad Sue is basically positive about the whole thing, but she seems very nervous about making it happen. I may have to do the hard-sell with my management, which I'm willing to do. Maybe they will be happy to let me go so they can bring on someone else from CRS!!
>
> Meanwhile, I'm writing up a little justification for Sue, from the NIO standpoint.

DEX 31, at LIB00382.

**Response:** Admit

77. In an email dated October 19, 2016, with a time stamp of 10:18 a.m., Plaintiff wrote to Ms. Vita:

> Per your request, I'm sending the following points of justification for a music division detail. I hope this is what you need, but if not, let me know and I'll revise.
>
> As I see it, these are some reasons I think NIO could spare me right now:
>
> - Communications role: Since NIO has recently added a communications director position, my job now has less responsibility. I produce internal news on a monthly basis. It has become very process oriented, so someone else could pick it up quickly and be able to do it. NIO could get someone on detail to cover this, as they did last summer when I was working mostly on the book festival.
>
> - Book festival co-director role (Book festival is now under NIO): NIO has assigned more management to this project, compared to how it worked pre-NIO. Because of that, and the large number of staff involved (both NIO and Library wide) my role could easily be absorbed.
>
> - I think this music division project is a great fit for my skills and experience, which includes seven prior years in the music division. I would really like to take advantage of this opportunity while it still exists. I may retire in 2 years anyway.

DEX 31, at LIB000359.

**Response:** Admit

78. In an email dated October 27, 2016, Plaintiff followed up with Sue Vita, the Chief of the Music Division, and Jan Laurisden, the Assistant Chief of the Music Division, regarding the detail. DEX 1, pp. 31:17-19; 33:3-34: DEX 2A, Manus Deposition Exhibit No. 2 at LIB000363.

**Response:** Admit

79. In an email dated November 21, 2016, time stamped 9:53 a.m., Plaintiff wrote to Ms. Ward-

Bamford:

> Any news about the Bromberg detail? Has Sue talked to Helena yet? I think we need to figure this out soon – my bosses are starting to ask me about the status. At least we know they will support it, so all that's left is Library Services.

DEX 2B, Manus Deposition Exhibit No. 3 at LIB000365.

**Response:** Admit

80. Ms. Vita reported to Helena Zinkham. DEX 1, p. 32:6-9.

**Response:** Admit

81. Library Services is the service unit in which the Music Division was located. DEX 1, at p. 43:9-14.

**Response:** Admit

82. In a December 20, 2016, email at 5:47 p.m., Ms. Vita emailed Ms. Ward-Bamford and Ms. Lauridsen in relevant part:

> If we were to get Sue's services on Detail, LS would have to reimburse NIO for her salary – so it is a budget cost and can't be supported. Re your need for help, it is true that you need help. However, so do other areas … and we need to prioritize. [Ms. Manus] could help us out in a couple of ways, but any detail would have to be advertised, not just offered to her, and I didn't get the go ahead from Helena about [] details."

DEX 32, at LIB000366.

**Response:** Admit

83. In a January 9, 2017, email, time stamped 3:30 p.m., Plaintiff wrote to Ms. Laurisden

> I wanted to check in about my possible detail position in the Music Division. The goal had originally been for me to start this in January, and it looks like it will be later than that – do you happen to know the plans for this? I'm hesitating to start any long term projects in my current job if I am going to be coming to the Music Division even for the short term.

DEX 42, at LIB000377.

**Response:** Admit

84. In an email dated January 10, 2017, time stamped 2:19 p.m., Plaintiff wrote to Ms. Ward-Bamford:

> I spoke with Jan, and she will speak to my supervisor. However, I just ran into Sue Vita and asked her – she made it very clear that there is no money in LS to pay for it, so NIO would have to foot the bill for all of it. Which is I guess why she hadn't moved on it further.
>
> I wasn't sure where things were administratively, but, it may be up to me to go begging to NIO for the money. My guess is they don't have it – I know there are budget problems. So, it's not looking too promising to me right now.

DEX 2C, Manus Deposition Exhibit No. 4, at LIB000376.

85. In a January 10, 2017, email at 4:22 p.m., Ms. Vita wrote to Ms. Lauridsen in relevant part:

> Helena said that in order to [do the Manus detail], LS [library services] would have to pay her salary. Helena is not in favor of it… I can't justify this over some of the other staffing needs that the Division has. So I told her we were not pursuing it.

DEX 43, at LIB00367.

**Response:** Admit

86. In an email dated February 1, 2017, at 10:52 a.m., Plaintiff wrote to Ms. Ward-Bamford:

> Oh yes, I ran this [plan for a detail by Jan] and she liked it. Now Sue is throwing a wrench in this, so we are on hold again. This is really starting to cause a problem for me in my job.
>
> I wish Sue would just let this run its course – no matter what happens, the Music Div (sic) will be no worse off, and may even be better off since NIO will have to cover my salary. Stay tuned…

DEX 2D, Manus Deposition Exhibit No. 5, at LIB000399.

**Response:** Admit

87. In a document with subject line "vm" and start date of March 24, 2017, Plaintiff wrote, in relevant part:

> Points to make w/ Vicki Magnus, [Chief, Office of EEO and Diversity Programs] when I speak with her
>
> I'd like to make an appt. to discuss my work situation in NIO, to see if you can provide any guidance).
>
> -My job in NIO has gone downhill - much LESS responsibility than I had even a year ago.
>
> o More layers - More layers of management, new GS15s, that have taken over projects that I previously had more involvement in.
>
> • Comm chief
>
> • Strategic programs (book fest)
>
> • I didn't even get an interview for the comm job! And I was doing it already.
>
> o Was taken off the Book Festival, no explanation. But I thought I was close to MD detail at that time, and told them so.
>
> o Personalities - Work for 2 people from CRS who talk amongst themselves and leave me out - different/foreign culture to me. Also younger. Cronyism.
>
> o Support - Not enough support at the end of the day
>
> o Am kept out of the loop on many projects. (Didn't get told about Justice Ginsberg event on 3/16)
>
> • My boss is involved in Book Festival stuff.
>
> • Am given tasks to do, without much context

o Bad workspace - am planning on making the case for new one. I sit in the middle of management area, w/ no privacy. Feels like a private club where I'm not a member. Update - may get a different "cubicle" only.

-Am trying for a detail to Music Div

o Multiple discussions with management there, they are on board. It would be a much better situation all around.

o Music Chief is dragging her feet on a decision. Probably internal politics. She tends to be very cautious. LS said OK in general, but NIO would have to pay my salary.

o I am therefore ON HOLD, which has prevented me from making progress here or elsewhere. (Could potentially get another detail, have also held back form (sic) workspace, telework, etc.)

o NIO previously expressed support for some arrangement there, so it is still possible.

o Ideally, would like a transfer.

-What is possible here? Can I get out of NIO?

o Due to the marginalizing of my job, I think NIO should take the responsibility for a transfer. They are not using me as intended! And, the personalities would prevent otherwise too.

o I don't think I am needed there anyway- they could get a couple interns to fill in.

I think it's personalities - they brush me aside, pushing me farther down the food chain. Meanwhile, there is this other option which is hanging out there unresolved. So, can we resolve it??

What are some really long term options? Retire, and get hired part time by Music div?

DEX 33, at LIB000400-01; DEX 2E, Manus Deposition Exhibit No. 6, at LIB000398.

**Response:** Admit

88. In a March 24, 2017, email, at 3:05 p.m., Plaintiff wrote to Ms. Lauridsen:

> But I wanted to give you a heads up regarding the possible detail for me in the Music Division. I met with the EEO here at the Library, and they suggested doing a "swap detail" with someone/anyone in Library services, which is apparently done quite often. That is someone in LS would be assigned to my job in NIO. In this case, it would be arranged entirely through the EEO and therefore take the burden off the Music Division. Nothing is set yet, but there may be progress in the next week, so you may be hearing something about that. (And NIO knows nothing of this yet).

DEX 34, at LIB000397.

**Response:** Admit

89. In a document with the subject line "contact" and a start date of April 4, 2017, Plaintiff recorded notes of her conversation with Ms. Magnus, the Chief. DEX 1, p. 39:16-40:2; DEX 2E, Manus Deposition Exhibit No. 6 at LIB000398 In relevant part, the document reads:

> Wheels are in motion! Vicki is going to try and mediate the situation, taking it out of Sue V's hands. She will try to find a person in Library services for a "swap detail" – to ask around. Probably to start as a short term detail… It could grow into a longer term situation, on both ends…..

**Response:** Admit

90. In a document with the subject line of "detail" and a start date of April 17, 2017, Plaintiff wrote:

> Vicki M called –
>
> Ellis said OK to go ahead with "something", for me to move to MD. So OK from NIO (condescending but whatever)
>
> Vicki will work with Library services now – will contact Jan in MD. Since it's closer to end of year, LS may have some extra money avail for a bonafide move! If not, will work on a swap detail.

DEX 35, at LIB000427.

**Response:** Admit

91. In an email dated May 31, 2017, time stamped 2:17 pm., Plaintiff wrote

> Bad news – Vicki was not able to work out a detail/transfer to the music division for me at all. Apparently, people are nervous about budgets and FTE positions. And NIO is not willing to pay for a detail for me. Meanwhile I'm going to try and transfer within NIO, we'll see. Otherwise, I had a "Hail, Mary" idea – if the Music Division could hire me part time as a contractor in 2018, then I could retire and do it that way. It's maybe a long shot. But I would have to wait until the 2018 budget is set.

DEX 2F, Manus Deposition Exhibit No. 7, at LIB000417

**Response:** Admit

92. In a document with the subject line "music note," with a start date of June 20, 2017, Plaintiff wrote:

> Vicki says "no go" on any detail, music or otherwise due to budget constraints. Huh.
>
> Talked to Carol Lynn today (6/20) – she said Sue V. really wanted to have me but couldn't work it out – couldn't pay for it. She knows I went through EEO. So, that was at least positive.
>
> CL will talk to Jan L., feel her out for the possibility of a contract position for me in 2018. It would be part time and probably at FS 12/13 level. All good!! Apparently there is some extra money?
>
> CL will let me know what she hears. And if Sue V. is away, so I can go to Jan. The master plan – I will retire before the end of the year, then work out any part time work later on. No way I can wait out this sucker any longer.

DEX 2G, Manus Deposition No. 9, at LIB000415.

**Response:** Admit

93. In a June 22, 2017, email time stamped 1:09 p.m., Plaintiff wrote to Ms. Iwaskiw

I just had a meeting with Brenda B. in HR, to figure out what I need to do to retire this year.

DEX 36, at LIB000414.

**Response:** Admit.

94. In a June 22, 2017, email time stamped at 1:41 p.m., Plaintiff wrote

> I've given up on the detail – it would take a while to set up, and not worth the trouble at this point just for the sake of a few more months.

DEX 36, at LIB00414.

**Response:** Admit

95. In an email dated July 10, 2017, Plaintiff wrote in relevant part:

> In case you haven't heard – I had a talk with Jan L. on Friday about possible work in the Music Division. She told me about Nick's reassignment, and needing someone in the Concert Office to help out in his absence. So, she is going to talk to Sue V. about me taking on that role for a short term detail – which I hope can happen.

DEX 2H, Manus Deposition Exhibit No. 10, at LIB000411.

**Response:** Admit

96. In document with subject line "mtg" and starting date of August 14, 2017, Plaintiff wrote, in relevant part:

> – Detail in concert office: music div wanted to get me for a detail, Helena Z said no, she thought a GS 14 would raise red flags, didn't want to favor one person to do this…
> – Is it advisable to go around Helena, talk to Mark Sweeney? Should I do this, or should Vicki?
> – Also, new project idea came u, working with YRC and music project.
> – Music Div will be hiring NTES in 2019 for archival stuff. Maybe they could do a contractor? That would be good, too. Do you know if that type of thing is happening?
> – I see from the Gazette, there are lots of temps, reassignments.
> – Retirement is an option – and maybe the best one!

DEX 37, at LIB000409.

**Response:** Admit

97. In an August 14, 2017, email time stamped 10:44 a.m., Plaintiff wrote to Ms. Ward-

Bamford about "pitching" the "idea of instrument making for young kids" to Lee Ann and

"talk[ing] about a job detail."

DEX 38, at LIB000408.

**Response:** Admit.

98. In an August 18, 2017, email time stamped 2:52 p.m., Plaintiff again wrote to Ms. Ward-Bamford about "figur [ing] out our "pitch" to make to Lee Ann Potter" for a detail in the Education Outreach part of NIO.

DEX 39, at LIB000407.

**Response:** Admit

99. On September 7, 2017, and again on September 12, 2017, at 3:49 p.m., Plaintiff asked Ms. Magnus about a possible detail in Education Outreach. DEX 40, at LIB000454; DEX 41, at LIB000405.

**Response:** Admit

100. Plaintiff is not alleging race discrimination. DEX 1, p. 66:12-14.

**Response:** Admit

# STATEMENT OF MATERIAL FACTS IN DISPUTE

1. Plaintiff was constructively discharged from her position as Digital Media Project Coordinator GS-14 on September 30, 2017. *See* Client Affidavit, Exhibit ("Ex.") A at 52.
2. Plaintiff believed that she would be fired if she had not resigned based on Brachman's actions including the counseling memo. Ex. A at 52.
3. Plaintiff received her first negative performance evaluation on April 3, 2017. Ex. A at 16.
4. Plaintiff received positive feedback for the 2016 National Book Festival detail from Lamolinara. Ex. A at 25.
5. On or about March 2017, Brachman spoke to Lamolinara about Manus' role in the Book Festival and Lamolinara told me that he had given me a rave review to Brachman. Ex. A at 26.
6. Upon information and belief, Mr. Lamolinara receive a prestigious award and/or a bonus as a result of the success of the National Book Festival. Ex. A at 27.
7. Since Ellis Brachman became Manus' supervisor in September 2016, he clearly preferred to associate with younger staff. In general, he talked to Manus very little, but talked to other younger staff members in passing all the time, including to summer interns. Ex. A at 29.
8. Brachman routinely disregarded me in meetings, as compared to younger staff. When we started meetings with the larger group, he did not acknowledge me or my role to the group in any major way. As Manus was his de-facto deputy, Manus believed it was inappropriate that he ignored me in this way. There would be a "round robin" at the end of each meeting where everyone would offer project updates, questions, etc. and he would always respond more to the younger staff. When it was Manus' turn, he had no response or acknowledgement to anything Manus said, almost as if he did not know her. During one meeting, he even skipped over me altogether and Manus had to remind him that it was her turn to speak. Ex. A at 30.
9. During the smaller, regular meetings with his supervisor (to discuss the ongoing general work, informational sessions), Brachman would routinely ignore me, and just talk to his supervisor. Once or twice, Manus saw him make a face at her after something Manus said. Ex. A at 31.
10. Brachman cut me off from projects, compared to younger staff. Manus heard through administrative staff, that he had "pushed" to include a much younger staff member, "Sasha", who was younger, to go to a big conference (Annual ALA in Chicago). Michelle Spezzacatena ("Spezzacatena"), a much younger employee also participated in this conference. Manus was not included in any of this conference activity. Ex. A at 32.

11. Spezzacatena was 39 old years old. See Ex. K. (Defendant's Responses to Plaintiff's First Set of Interrogatories at No. 18).

12. Brachman did not assign Manus any involvement in the prestigious Women in the Arts panel discussion at the Library (March 22, 2017), but did assign Spezzacatena, This was despite the fact that Manus had an extensive background in the arts, and upon information and belief, Spezzacatena did not. Ex. A at 34.

13. Brachman did not include Manus in any marketing projects, meetings or emails for these special projects, which had the effect of marginalizing me and keeping me from important relevant information, which had a directly negative impact on my job performance. Ex. A at 35.

14. Brachman was aware Manus had contacted the EEO office in or around April or May 2017. See Ex. C, Brachman Dep. Tr., T105:5-109:1; Ex. D, Magnus Dep. Tr. T51-55.

15. If Manus approached Brachman with a question related to my work such as "Can I ask you something?" or "Can I show you something?", he would usually brush Manus off and say "I don't have time." Ex. A at 37.

16. In or around mid-May, 2017, Brachman berated Manus by email with a copy to his supervisor, Shogan, before and instead of discussing the issues with her, regarding a draft for a newsletter. His tone was accusatory, exaggerating, and the fact he copied his boss made it seem punitive. Ex. A at 38.

17. Manus sent a response addressing the points in his email but Brachman did not respond. His supervisor (Shogan) did not seem willing to discuss the issues. Manus responded to Shogan, noting Brachman's illogical and shaming behavior, with a reminder that Manus was indeed hoping to be detailed away from him, which would "solve the problem". *See* Ex E, May 15, 2017 email to Shogun.

18. Soon after the berating email from Brachman in May, 2017, Manus met with Magnus again and told her that my concerns were increasing about my supervisor due to this latest issue. Manus followed this up with an email about the same, begging for a solution and reassignment." *See* Ex F, May 17, 2017 email to Magnus.

19. Manus continued working with the EEO office on or around March through June, 2017, to get a Music Division detail assignment, but was turned down due to alleged budgetary constraints. Ex. A at 41.

20. During July, 2017, Manus worked with the Music Division to get an additional detail, but Manus was not able to get one. Ex. A at 42.

21. On June 6, 2017, Brachman wrote to Kym Tran about Manus' work without Manus' knowledge. *See* Ex G, Defendant's Statement of Undisputed Material Facts ("SOUMF"), DEX 15, Bates LIB000713.

22. On July 5, 2017, Brachman wrote to Robert Casper without Manus' knowledge and asked him to look at redline changes he had made to an article written by Manus and to let him know if he had missed anything. Brachman also asked Tran without Manus' knowledge if an article he had edited from Manus "had enough red [lines] to be a problem for a [GS]14?" *See* Ex G., SOUMF, DEX 15, Bates LIB000705.

23. Manus had a meeting with Magnus on August 14, 2017 to address the idea of a possible project with Education Outreach team within NIO and she called Brachman to discuss this. The Agency's September 30, 2018 Answer provides at No. 29:

> Defendant admits that, on or about August 14, 2017, Plaintiff met with Ms. Magnus to discuss a possible detail assignment within NIO to Education Outreach and that Ms. Magnus reached out to Mr. Brachman regarding this potential opportunity. *See* Ex G, Agency's September 30, 2018 Answer.

24. On September 7, 2017, Magnus informed Manus there was still no resolution on the Education outreach detail. Ex. A at 46.

25. On September 12, 2017, Manus received a request for a meeting for "mid-year review" from Brachman with just a couple hours' of notice, and was provided no advance copy of any evaluation or memo, and no warning that the memo would be issued. Ex. A at 47.

26. The September 12, 2017 Performance Counseling Memorandum ("counseling memo") was outside the normal process of a performance evaluation; it was more than a routine evaluation as it was overwhelmingly negative, contained clear consequences, was written down in a formalized way, delivered with a hostile attitude, and put in my permanent work file. This could have negative consequences down the road for her Library career, or elsewhere, and Manus believe it was issued by Brachman based on his discriminatory animus towards her based on my age and in retaliation for my EEO activity. Ex. A at 48.

27. The September 12, 2017 Performance Counseling Memorandum required Manus to do about twice as many work assignments as her usual workload. Ex. A at 49.

28. 47. On September 14, 2017, Manus met with Vicky Magnus again due to this new counseling memo problem. Magnus described the situation; she said it was "constructive discharge" and she handed Manus a Discrimination Complaint form, telling me what her options were. Ex. A at 50.

29. During her last week on the job, Manus heard that Brachman had announced (at a meeting) that another, much younger staffer, would be taking over my duties once Manus retired. Ex. A at 50.

30. The September 12, 2017 Performance Counseling Memorandum was issued one month after Manus became eligible for retirement. Ex. A at 51.

31. Manus also took a retirement seminar about a month before the counseling memo. A copy of the email Manus sent Brachman on August 3, 2017 about my attendance at a three day pre-retirement planning seminar is attached. See Ex H, August 3, 2017 email to Brachman. Ex. A at 52.

32. Manus believed that she would be fired if Manus had not resigned based on Brachman's actions including the counseling memo. Ex. A at 53. The memo stated in part as follows:

> You are advised that failure to demonstrate your ability...during this 35 day period may result in further administrative action...
> *See* Ex I, September 12, 2017 Performance Counseling Memorandum, p. 5.

33. The counseling memo was issued according to the LCR 9-1310, which provides under "Obligation to Fulfill Position Requirements", under Section 4: "the supervisor may recommend the staff members reassignment, transfer, demotion or separation." As Manus had already tried to get a detail/reassignment/transfer several times, it seemed that demotion or separation was possible. Ex. A at 54.

34. The counseling memo was never provided to me in draft form; Manus was never provided a meeting, a warning or any prior notice as to its contents, and no opportunity to meet with Human Resources about my performance or about the memo prior to its issuance. Brachman had been very positive in the last prior meeting on or about May 30, 2017. Brachman did not meet with me at all between May 30, 2017 until September 12, 2017. Manus was not aware that there was any issue with my performance that would require such drastic action as the counseling memo. Manus had no opportunity refute it prior to its issuance. Brachman did not meet with me but met with other people behind my back. This is not the normal course of action at LOC in my experience and certainly something Manus never expected. Ex. A at 55.

35. Manus was not aware of the discussions Brachman had with Kym Tran in the Human Resources Office about my performance, which led to the issuance of the memo. See Ex. F, SOUMF at page 6, para. 34 to page 7, para.42. Ex. A at 56.

36. The counseling memo was the most negative experience from a supervisor in my entire career. Manus believe that having this very negative mark from my last supervisor prevents me from getting a good supervisor recommendation for any future jobs. This affects my career and financial prospects. Ex. A at 57.

37. When Manus was seeking a detail in Education Outreach, Brachman told me, at the September 12th counseling meeting, that this detail was not available and that there were no details. In reality, details were often available all over the LOC for different reasons, and Brachman was aware of this. In his deposition, Brachman admitted that "there were a number of details" at the time Manus was asking for a detail, and admitted what is actually the practice of the Agency, that details are often "used to allow expertise for certain things ... Details happen all the time in different ways." Brachman also stated that details "can be a formal process or an informal process." See Ex. B, Brachman Dep. Tr., T100:6-7; T97:4-8; T118:12-14.

38. Manus had one meeting with Brachman as part of the new set of assignments in the performance memo on or around September 18, 2017. He was 30 minutes late, and was coming from a project meeting. As before, he had not told me anything about this project either, indicating he would continue to keep me out of the loop going forward. Manus believed this was a signal that there was indeed no hope for success. Ex. A at 59.

39. After Manus retired from LOC, Brachman hired Bailey Cahall to a detail of 20 hours a week to do the work that I previously done. See SOUMF, p. 9, para. 54.

40. Manus had more seniority, experience and skills than Ms. Cahall. Ex. A at 62.

41. Ms. Cahill is under 40 (33) years old and has not engaged in any prior EEO activity. See Ex. J. (Defendant's Responses to Plaintiff's First Set of Interrogatories at No. 18).

42. Manus filed a formal complaint of discrimination, retaliation and hostile work environment to the EEOC (EEO 18-003), on December 21, 2017, based on LOC's ongoing conduct against me. On January 26, 2018, the Agency issued a formal decision denying the Complaint. *See* Exs. K, Complaint EEO 18-003 & L Agency decision denying the Complaint.

43. Manus has never filed an EEO complaint about any other supervisor. Ex. A at 64.

44. At the time of my retirement on September 30, 2017, my salary was $138,160. *See* Ex. M, SOUMF at page 9, para. 53.

45. Manus pension is substantially lower because she retired in 2017 than it would have been if she had retired later. Ex. A at 66.

September 20, 2019

Respectfully submitted,

By: ________/s/____________________

Donna Williams Rucker (D.C. Bar No. 446713)
DEPUTY MANAGING PARTNER
Tully Rinckey, PLLC
815 Connecticut Ave., N.W.,
Suite 720
Washington, DC 20006
(202) 787-1900
drucker@fedattorney.com

*Attorney for Plaintiff*