**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| SUSAN MANUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-1146 (KBJ) |
| | ) | |
| CARLA D. HAYDEN, *Librarian,* | ) | |
| *Library of Congress*, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

On September 12, 2017, Plaintiff Susan Manus—a retirement-eligible employee of the National and International Outreach ("NIO") division of the Library of Congress—received a performance counseling memorandum, including a long-term improvement plan, from her supervisor. (*See* Compl., ECF No. 1, ¶¶ 30–33.) Ten days later, Manus announced her retirement. (*See id.* ¶ 34.) In the instant lawsuit, Manus claims that her supervisor's persistent critiques of her work performance, which commenced shortly after his hiring, constituted age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq*. (*See id.* ¶ 54–65.) Manus further claims that the performance counseling memo was given to her in violation of the anti-retaliation provisions of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e, *et seq*., because her supervisor knew that she had previously contacted the Library's Equal Employment Opportunity ("EEO") office to inquire about the possibility of being detailed to another Library position. (*See id.* ¶ 40–51.) And Manus also maintains that her supervisor's discriminatory and

retaliatory conduct forced her to retire from her job earlier than she otherwise would have and, thus, that she was constructively discharged.  (*See id.* ¶¶ 40–51, 54–65.)

Before this Court at present is the Library's motion for summary judgment with respect to Manus's ADEA and Title VII claims (*see* Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11), which Manus opposes (*see* Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl's Opp'n"), ECF No. 15).  In the motion for summary judgment, the Library argues that Manus's ADEA claims fail, because she has not identified a cognizable adverse action (*see* Def.'s Mot. at 6) and has not alleged facts that could possibly give rise to an inference that she was unlawfully constructively discharged (*see id.* at 20).  The Library also contends that Manus's Title VII retaliatory discharge claim cannot be sustained, both because Manus did not suffer any materially adverse employment action, and because her supervisor had specific knowledge that she had not engaged in any protected activity with respect to her contacts with the EEO office at the time that he tendered the performance counseling memo.  (*See id.* at 16–17.)

For the reasons explained fully below, this Court agrees with the Library that the record is manifestly insufficient to establish that the Library took any legally cognizable adverse action against Manus due to her age or protected activity.  Nor is the evidence sufficient to support a reasonable inference that Manus either engaged in a protected activity prior to the allegedly adverse actions or was ultimately constructively discharged.  Consequently, Manus cannot proceed to trial on any of her claims, and the Library's motion for summary judgment will be **GRANTED** in full.  A separate Order consistent with this Memorandum Opinion will follow.

## I.   BACKGROUND

### A.   Factual Background[1]

Plaintiff Susan Manus became the Coordinator of Communications Strategy at NIO in 2015, after transferring out of the Library's Music Division.  (*See* Def.'s Ex. 1 ("Manus Deposition"), ECF No. 11-3, at 18; *see also* Pl.'s Ex. A ("Manus Affidavit"), ECF No. 15-2, at 3–4.)  In September of 2016, Manus applied for the newly created position of Chief Communications Officer of NIO.  (*See* Manus Deposition at 8.)  That job was reposted after the first application window closed and no interviews were conducted, but Manus did not reapply because she "wasn't sure that [she] wanted that role at that point[.]"  (*Id.*)  Indeed, by that time, Manus had begun speaking with a former colleague at the Music Division, Carol Ward-Bamford, about the possibility of creating a detail assignment for Manus at the Music Division; "[m]aybe a short term, renewable detail . . . as long as it would end up as long-term somehow."  (*See* Def.'s Ex. 25, ECF No. 11-5, at 21.)  According to Manus's contemporaneous notes, insofar as the proposed detail was concerned, Manus's "[g]oal [was] long term, [un]til retirement!"  (Def.'s Ex. 28, ECF No. 11-5, at 27.)

In mid-September of 2016, as Manus's plans for the detail were developing, a new Chief Communications Officer of NIO—Ellis Brachman—arrived and became Manus's direct supervisor.  (*See* Manus Deposition at 11–13.)  Following Brachman's onboarding, Manus and Ward-Bamford put together a written proposal concerning

---

[1] The facts recited herein, which are undisputed, are drawn from the various exhibits attached to the parties' briefs, which include depositions, e-mail exchanges, and contemporaneous notes in the form of e-mail drafts.

Manus's plans for the detail to the Music Division.  (*See* Def.'s Ex. 30, ECF No. 11-6, at 2.)  With respect to the reasons for Manus's request to be detailed to another office, the proposal explained that, "[s]ince [Manus's team] has recently added a communications director position, [her] job now has less responsibility."  (Def.'s Ex. 31, ECF No. 11-6, at 5.)  During the conversations that ensued concerning the detail, it became clear that the Music Division had two problems with Manus's proposal: (1) "the need for salary reimbursement" from NIO, and (2) "the need to advertise a detail, not just offer it to a person[.]"  (Def.'s Ex. 32, ECF No. 11-6, at 7.)

Notably, in parallel with the development of the plans for Manus's detail, Brachman began "document[ing] [Manus's] work when it [did] not meet fully successful standards."  (Def.'s Ex. 7, ECF No. 11-4, at 29.)  This was because, according to Brachman, "from the beginning of [his] time at [the NIO], it was clear that [Manus] was not performing the full duties of her job."  (Def.'s Ex. 4 ("Brachman Deposition"), ECF No. 11-4, at 5.)  For instance, in an e-mail dated January 31, 2017, Brachman told Manus that he was "disappointed with the content" of Manus's draft of the February monthly newsletter, since it appeared that several of the blurbs had been "pulled verbatim from other material—including references to dates (today, this week, etc[.]) which are no longer true."  (*Id.*)

According to Manus's personal notes, on March 24, 2017, Manus met with the EEO office in order to discuss how "[her] job in NIO has gone downhill—much LESS responsibility than [she] had even a year ago"—which Manus attributed to Brachman's hiring, and Manus specifically mused about whether, if a detail to the Music Division was not a possibility, there were other "really long term options[,]" including to

"[r]etire, and get hired part time by Music [D]iv[.]"  (Def.'s Ex. 33, ECF No. 11-6, at

9–10.)  Manus made clear in an e-mail to a colleague that "NIO knows nothing of this

yet."  (Def.'s Ex. 34, ECF No. 11-6, at 12.)

A short time later, in early April of 2017, Brachman issued to Manus her annual

performance rating for the March 2016 through March 2017 period.  (Def.'s Ex. 2K,

ECF No. 11-3, at 68.)  The document stated that, although "Manus spent a majority of

this performance period on detail as Co-Director of the 2016 National Book Festival[,]"

which has "been called 'the best' book festival in the Library's history[,]" Manus's

work product at NIO "does not consistently meet expectations[.]"  (*Id.* at 70.)

In the wake of this report, Manus had two contacts with the Library's EEO

office.  First, according to Manus's contemporaneous notes, the EEO office let Manus

know, on April 3, 2017, that the office was planning to "talk to Ellis [Brachman] to try

and work out [a] swap [detail]" between Manus and a lower-level employee at the

Music Division.  (Def.'s Ex. 2E, ECF No. 11-3, at 43.)  The record indicates that, in

mid-April of 2017, the EEO office did, in fact, contact Brachman to inform him that

Manus was interested in obtaining a detail in the Music Division and that the EEO

office would work to facilitate that conversation, as per the office's usual practice.  (*See*

Brachman Deposition at 9–10; Def.'s Ex. 5 ("EEO Staff Deposition"), ECF No. 11-4, at

20.)  During this communication, the EEO office specifically stressed to Brachman that

"this is not an EEO complaint, it's not a grievance, it's not an alternative . . . resolution

dispute[.]"  (EEO Staff Deposition at 20; *see also* Brachman Deposition at 10.)

Moreover, Brachman apparently informed the EEO office that he did not have any

problem with Manus's attempt to look for detail opportunities (*see* Brachman

Deposition at 10); in fact, he would welcome the proposed detail so long as the expenses involved were reimbursable (*id.*; *see also* EEO Staff Deposition at 20). Manus's second contact with the EEO office came on April 17, 2017, when, according to Manus's notes, the EEO office contacted her to let her know that "Ellis [Brachman] said OK to go ahead with 'something', for [Manus] to move to [the Music Division]." (Def.'s Ex. 35, ECF No. 11-6, at 14.)

In the weeks that followed, Manus continued to receive critical performance-related feedback from Brachman. In May of 2017, for example, Brachman e-mailed Manus to inform her that an article she had drafted "seem[ed] very disjointed" and needed to be "streamline[d]" so that it told a "coherent story[.]" (Def.'s Ex. 12, ECF No. 11-4, at 45.) Manus edited the draft, but Brachman subsequently noted that, even then, "[u]nfortunately[,] it took a lot of [further] editing" on his part. (Def.'s Ex. 13, ECF No. 11-4, at 50.) A few weeks later, Brachman e-mailed Manus and copied his own supervisor to let Manus know that a draft she had shared was not "acceptable" because some of the content was repeated from an earlier announcement, and the formatting, fonts, and spacing were not consistent. (Def.'s Ex. 14, ECF No. 11-4, at 55.) Manus felt that, throughout this time, Brachman was "mak[ing] things more difficult for [her] than he needs to," only to "then criticize[] [her]" (Pl.'s Ex. E, ECF No. 15-3, at 16), and she also believed that Brachman preferred to "associate with younger staff" because "he talked to [her] very little, but talked to other younger staff members in passing all the time, including to summer interns" (Manus Affidavit at 5). Manus also thought that Brachman "disregarded [her] in meetings as compared to younger staff"; "ma[d]e a face at [his supervisor] after something [Manus] said"; and

"pushed" to include "much younger" staff members in conferences and panel

discussions but did not do the same for her.  (*Id.* at 4.)

In May of 2017, according to Manus's complaint, Brachman's continued

criticism prompted Manus to complain about him with the EEO office; at that point,

Manus was allegedly "afraid that she [was] now in a hostile work environment."

(Compl. ¶ 25.)  In particular, Manus met with the EEO office to express that her

"concerns were increasing about [her] supervisor due to this latest issue"—that is, what

she referred to as "the berating e-mail from Brachman in May 2017"—and she also

wished to follow up on the possibility of a detail.  (Manus Affidavit at 6.)  The day

after this meeting, Manus e-mailed the EEO office: "I hope we can arrange a detail very

soon—even if it's just for 8-10 months.  As I told you yesterday, I've been having an

even rougher time lately—my boss sometimes will 'shame' me via e-mail and copy his

boss.  He goes way overboard on the criticism, which happens on almost every

document I turn in.  I realize I can't succeed in my job if I'm working for him.  This is

very stressful, so I'm anxious to make a change soon."  (Pl.'s Ex. F, ECF No. 15-4, at

2.)

Beginning in the summer of 2017, Brachman began sharing Manus's work

product with the Library's Human Resources office, specifically noting the amount of

editing that he purportedly had to do in order to improve her written work product.

(*See* Def.'s Exs. 15–16, ECF No. 11-4, at 59, 61.)  Brachman also met with the Human

Resources staff to discuss the particular tasks that he planned to "lay out for [Manus]

for the next few months[.]"  (Def.'s Ex. 17, ECF No. 11-4, at 67.)  Human Resources

advised Brachman that, based on the work samples he had shared, "Manus was not

performing up to the level of her expected work[,]" and, according to Brachman, Human Resources "suggested that at this point the proper course was a performance memo." (Brachman Deposition at 6.) Accordingly, in July of 2017, Human Resources drafted a performance counseling memorandum and e-mailed it to Brachman for his review and edits. (*See* Def.'s Ex. 18, ECF No. 11-5, at 2.)

Meanwhile, Manus came to realize that "budget constraints" prevented the consummation of any deal to detail her to the Music Division, and her former colleague, Ward-Bamford, offered to inquire internally at the Music Division about "the possibility of a contract position for [Manus] in 2018[.]" (Def.'s Ex. 2G, ECF No. 11-3, at 47.) In her personal notes, Manus specifically stated that her "master plan" was to "retire before the end of the year, then work out any part time work [with the Music Division] later on" because there was "[n]o way [she] can wait out this sucker any longer." (*Id.*; *see also* Def.'s Ex. 2F, ECF No. 11-3, at 45.) Thus, in late June of 2017, Manus met with the Human Resources office "to figure out what [she] need[ed] to do to retire th[at] year" because she had "given up on the detail—it would take a while to set up, and [was] not worth the trouble at this point just for the sake of a few more months." (Def.'s Ex. 36, ECF No. 11-6, at 16.)

Manus continued her discussions about the possibility of a post-retirement contractor position at the Music Division through the rest of the summer (*see, e.g.*, Def.'s Ex. 2H, ECF No. 11-3, at 49; Def.'s Ex. 37, ECF No. 11-6, at 18), and she also continued informing herself about pre-retirement planning (*see* Pl.'s Ex. I, ECF No. 15-5, at 11). Manus somehow momentarily returned to the idea of creating a detail for herself in August of 2017, this time as a detail to the Educational Outreach team.

(Def.'s Ex. 38, ECF No. 11-6, at 20.)  Manus spoke with the EEO office about this possibility and, once again, the EEO office reached out to Brachman and secured his blessing.  (*See* EEO Staff Deposition at 23.)  However, ultimately, the EEO office confirmed that no such detail opportunity existed at that time.  (*Id.* at 24.)

In September of 2017, Human Resources followed up with Brachman about the draft performance counseling memorandum that the Human Resources staff had shared with him in July.  (*See* Def.'s Ex. 20, ECF No. 11-5, at 6.)  Brachman apologized for the delay in responding and asked Human Resources if performance counseling was "still the right approach given that [Manus's] mid-year review [would be] due in the next few weeks."  (*Id.*)  Human Resources replied: "Absolutely! Her performance is far below successful, so you're actually doing her a favor: (1) you're telling/warning her she's in danger of being rated unsuccessful, and (2) you're giving her an opportunity to improve & turn that ship around."  (*Id.*)  Brachman agreed, and he "wrap[ped] up the draft memo" on September 11, 2017.  (*Id.*)  The next day, September 12, 2017, Brachman asked Manus to meet with him to "discuss [her] mid-year review[.]"  (Def.'s Ex. 21, ECF No. 11-5, at 8.)

During that meeting, Brachman allegedly informed Manus both that he was aware that she "had been going to EEO" and that he was providing her with a performance counseling memorandum.  (Compl. at ¶¶ 30–31.)  The memorandum specifically noted "deficiencies . . . in the quantity and quality of [Manus's] work" and stated that Manus's "performance . . . [was] below an acceptable level of competence and [did] not meet the performance requirements" of her position.  (Pl.'s Ex. J, ECF No. 15-5 at 13.)  The memo further explained that, given the negative feedback that had

been "noted in multiple reviews[,]" Manus would be placed "under performance counseling over the next 35 calendar days[,]" and that she would have "not less than 90 calendar days to improve [her] performance[.]" (*Id.*) Brachman also provided Manus with a detailed performance plan with goals that she was required to meet. (*Id.* at 17.) According to Manus, she "was not aware that there was any issue with [her] performance that would require such drastic action," especially "one month after [she] became eligible for retirement[,]" and the performance counseling memo actually "required [her] to do about twice as many work assignments as [her] usual workload." (Manus Affidavit at 7–8.)

Immediately after her meeting with Brachman, Manus e-mailed the EEO office to say: "I wanted to check in [again] about the possible detail in Educational Outreach—is this at all a possibility? If not, I will need to speak to you anyway," because "I think I am being set up to fail in my job." (Def.'s Ex. 41, ECF No. 11-6, at 26.) In its written response, the EEO office let Manus know that "[i]t does not seem a detail to Ed[ucation] Outreach is possible" and set up a meeting with Manus. (Pl.'s Ex. Q, ECF No. 15-8, at 11.) In the meeting, Manus expressed that "she felt . . . she was in a hostile work environment" and asked if she could "file . . . an EEO complaint if she retired." (EEO Staff Deposition at 25.) In response, the EEO office handed Manus an employment discrimination complaint form. (*See* Manus Affidavit at 7.) Ten days later, Manus notified the Library of Congress that she would retire the following week. (*See* Def.'s Ex. 23, ECF No. 11-5, 17.) After Manus's retirement, Bailey Cahill—a younger Library employee who allegedly had no "prior EEO activity"—was detailed on a part-time basis to take over some of Manus's duties at NIO. (Manus Affidavit at 9.)

### B.    Procedural Background

Two months after retiring from the Library, Manus filed a formal complaint of discrimination, retaliation, and hostile work environment with the Equal Employment Opportunity Commission ("EEOC").  (*See* Pl.'s Ex. L, ECF No. 15-7, at 2–3.)  The EEOC denied the complaint because Manus did "not allege she suffered an adverse employment action" and had failed to "show that she was subjected to a hostile work environment."  (Pl.'s Ex. M, ECF No. 15-7, at 6.)  Manus's administrative appeal was denied as well, on the grounds that it was "unclear what actions [she] allege[s] created a discriminatory hostile work environment due to the [her] age[,]" and that she had not engaged in protected activity, given that she had only consulted the EEO office "regarding possible details or job opportunities[.]"  (Pl.'s Ex. P, ECF No. 15-8, at 8.)

On May 15, 2018, Manus filed the instant action against Carla Hayden in her official capacity as the Librarian of the Library of Congress.  (*See* Compl. at 1.)[2]  In her complaint, Manus alleges retaliation for protected activity in violation of Title VII of the Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e, *et seq.* (Count I), and age-based discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), *see* 29 U.S.C. § 621 *et seq*. (Count II).[3]  With respect to her age

---

[2] Manus initially identified James H. Billington, former Librarian of the Library of Congress, as the defendant.  (*See* Compl., ECF No. 1, at 1.)  Pursuant to Federal Rule of Civil Procedure 25(d), the Court later substituted Carla Hayden, the current Librarian of the Library of Congress (*see* Minute Order of Dec. 17, 2018), and consistent with common practice with respect to suits against government officials in their official capacity, this Memorandum Opinion treats Manus's action as if she had filed suit against the Library of Congress.  *See Cty. Bd. of Arlington v. Dep't of Transp.*, 705 F. Supp. 2d 25, 28 (D.D.C. 2010) ("[A]n official-capacity suit is a way of pleading an action against the agency which the official heads.").

[3] Although the first paragraph in Manus's complaint states that she is purportedly seeking "relief from discrimination based on her race (African American)" (*see* Compl. ¶ 1), the remainder of Manus's complaint only alleges age-based discrimination and Manus otherwise made no argument and offered

discrimination claim, Manus also suggests that she was constructively discharged from her position.  (*See* Compl. ¶ 62 ("Because Ms. Manus realized that she was being set up to fail, she was forced to retire earlier than she planned.").)

The Library filed a motion for summary judgment on August 16, 2019, at the close of discovery.  (*See* Def.'s Mot., ECF No. 11.)  In its motion, the Library maintains that Manus's ADEA claims fail because she has not identified a sufficiently "adverse" actions to support her discrimination claim (*see id*. at 6), and she has not met the high bar to prove constructive discharge (*see id.* at 20). The Library further argues that Manus's Title VII retaliation claim fails because Brachman has specific knowledge that Manus had only contacted the EEO office about doing a detail (*i.e.*, she had not engaged in protected activity), and, in any event, Manus did not suffer a materially adverse employment action due to her alleged engagement in a protected activity.  (*See id.* at 16–17.)  In her opposition, Manus argues that Brachman's various employment-related actions directed toward her qualify as "adverse" actions (*see* Pl's Opp'n at 10–13); that she was constructively discharged because, based on the "totality of the circumstances . . . [she] was effectively deprived of free choice in the matter such that she had no alternative but to resign" (*id.* at 19); and that her meetings with the EEO office qualified as protected activity (*id.* at 15–18).  The Library's summary judgment motion is now ripe for decision. (*See* Def.'s Reply to Pl.'s Opp'n ("Def.'s Reply"), ECF No. 16.)

---

no evidence in support of a claim for race discrimination.

## II.    LEGAL STANDARDS

### A.    Motion For Summary Judgment

To prevail on a motion for summary judgment, a party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is material if it could alter the outcome of the suit under the governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).  Once this showing has occurred, the nonmoving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and citations omitted).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Notably, when a motion for summary judgment is evaluated, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  However, "[t]he nonmoving party's opposition . . . must consist of more than mere unsupported allegations or denials and must be

supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial." *Brett v. Brennan*, 404 F. Supp. 3d 52, 58 (D.D.C. 2019) (citing Fed. R. Civ. P. 56(e)).  In other words, the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of [its] position[.]" *Anderson*, 477 U.S. at 252; *see also Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) ("[M]erely colorable or not significantly probative evidence . . . is insufficient to defeat a summary judgment motion." (internal quotation marks and citation omitted)).

Summary judgment in the defendant's favor "is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving testimony, unsupported by corroborating evidence, and undermined . . . by other credible evidence[.]" *Johnson v. W.M.A.T.A.*, 883 F.2d 125, 128 (D.C. Cir. 1989).  However, there is "no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion[.]" *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016) (quoting *Desmond v. Mukasey*, 530 F.3d 944, 964 (D.C. Cir. 2008)).

### B.     Title VII Retaliation And ADEA Discrimination Claims

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits the federal government from retaliating against employees who engage in protected activity, including complaining of employment discrimination.  *See* 42 U.S.C. § 2000e-3(a).  A plaintiff must present sufficient evidence to "show: (1) that [he] engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two[.]" *Morgan v. Fed. Home Loan Mortgage*

*Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003) (alteration in original) (internal quotation marks and citation omitted).

Importantly, the requisite protected activity refers to "*statutorily protected activities*[,] includ[ing] the filing of EEOC complaints . . . to vindicate claims of employment discrimination or retaliation" and "[i]nternal complaints . . . [that] must in some way allege unlawful discrimination, not just frustrated ambition." *Battle v. Master Sec. Co., LLC*, 298 F. Supp. 3d 250, 252 (D.D.C. 2018) (emphasis added) (internal quotation marks and citations omitted).  In addition, a materially adverse action in the retaliation context "encompass[es] a broader sweep of actions than those in a pure discrimination claim," *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008), since Title VII retaliation includes responsive conduct that "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination[,]'" *id.* at 1198 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  And while temporal proximity between the protected activity and the materially adverse action may "support an inference of causation," this is so "only where the two events are very close in time." *Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012).

The Age Discrimination in Employment Act of 1967 ("ADEA") is similar to Title VII's retaliation prohibition, in that it prevents employees from being subjected to adverse actions on the basis of an illicit motive of the employer.  The ADEA's federal-sector provision specifically states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age[,]" 29 U.S.C. § 633a(a), and the two "essential

elements" of an age discrimination claim under the ADEA are (1) that the plaintiff suffered an adverse employment action, and (2) the employer undertook such action because of the plaintiff's age.  *Baloch,* 550 F.3d at 1196; *see also Beshir v. Jewell*, 961 F. Supp. 2d 114, 130 (D.D.C. 2013).  In the ADEA context, an "adverse employment action" is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)).  And with respect to causation, an ADEA plaintiff can establish liability under the ADEA either by "establish[ing] that age was the but-for cause of the challenged personnel action[,]" *Ford v. Mabus,* 629 F.3d 198, 207 (D.C. Cir. 2010), or by "show[ing] that age was *a* factor in the challenged personnel action[,]" *id.* at 206 (emphasis in original).

At the summary judgment stage, in the absence of direct evidence, both Title VII retaliation claims and ADEA discrimination claims trigger the familiar burden-shifting, three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Ford*, 629 F.3d at 201 (discrimination under ADEA); *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (retaliation under Title VII).  First, a plaintiff must establish a prima facie case of prohibited retaliation or discrimination.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Ford*, 629 F.3d at 201; *Carter*, 387 F.3d at 878.  Once a plaintiff establishes her prima facie case, the burden of production then shifts to the employer to articulate legitimate, non-retaliatory or non-discriminatory reasons for the challenged employment decision.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Ford*, 629 F.3d at 201; *Carter*, 387 F.3d at 878.  And if the employer

proffers a legitimate, non-discriminatory/non-retaliatory reason, "the presumption of discrimination raised by the *prima facie* case is rebutted and drops from the case." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (internal quotation marks, alteration, and citation omitted); *see also Kersey v. W.M.A.T.A.*, 586 F.3d 13, 17 (D.C. Cir. 2009) (retaliation under Title VII). As a result, the burden then shifts back to the complainant to discredit the employer's explanation by showing that the employer's stated reason was pretext, and that the real reason was retaliation for the plaintiff's engagement in protected activity, *see Kersey*, 586 F.3d at 17, or discrimination based on a protected characteristic, *see Aka*, 156 F.3d at 1288–89.

Put another way, if the defendant articulates a legitimate non-retaliatory or non-discriminatory reason for the challenged adverse action, the court's sole focus then becomes whether or not the plaintiff has provided sufficient evidence for "a reasonable jury [to] not only disbelieve the employer's reasons, but [also] conclude that the real reason the employer took a challenged action was a prohibited one." *Walker v. Johnson*, 798 F.3d 1085, 1093 (D.C. Cir. 2015). Thus, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff[,]" *Gold v. Gensler,* 840 F. Supp. 2d 58, 66 (D.D.C. 2012) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)), and, ultimately, "the Court need only determine at the summary judgment stage whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race,

color, religion, sex, age, or national origin." *Peyus v. Lahood,* 919 F. Supp. 2d 93, 100 (D.D.C. 2013) (internal quotation marks, citations, and alteration omitted).

### C.   Constructive Discharge

Finally, to the extent that Manus maintains that she was forced to retire due to her working conditions in a manner that amounted to a constructive discharge, it is important to note that, whether an employee claims retaliation or discrimination, "[a]n employee's decision to resign is ordinarily presumed to be voluntary." *Stewart v. Gates*, 786 F. Supp. 2d 155, 167 (D.D.C. 2011).  Yet, "[i]n certain cases, the doctrine of constructive discharge enables an employee to overcome the presumption of voluntariness and demonstrate she suffered an adverse employment action by showing the resignation or retirement was, in fact, not voluntary." *Aliotta*, 614 F.3d at 566.  As a general matter, an employee is constructively discharged if her employer discriminates or retaliates against her to the point "that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted).  The employee's resignation is deemed "tantamount to an actual discharge" in such circumstances, *id.* at 1777, in order to "prevent[] employers from indirectly effect[ing] a discharge that would have been forbidden by statute if done directly[,]" *Ross v. U.S. Capitol Police*, 195 F. Supp. 3d 180, 202 (D.D.C. 2016) (internal quotation marks and citation omitted) (first alteration added).

"An actionable constructive discharge claim requires a showing that (1) intentional discrimination [or retaliation] existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's

conclusion that she had no option but to end her employment." *Lewis v. District of Columbia*, 653 F. Supp. 2d 64, 81 (D.D.C. 2009). As the Supreme Court has explained, a successful claim for constructive discharge points to circumstances "[b]eyond" those that are necessary to "establish [a] hostile work environment" claim; indeed, the plaintiff must "show[ ] . . . that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Penn. State Police v. Suders*, 542 U.S. 129, 133–34 (2004). Therefore, a hostile work environment claim is a "predicate for a constructive discharge claim." *Nichols v. Young*, 248 F. Supp. 3d 1, 11 (D.D.C. 2017); *see also McKeithan v. Boarman*, 2012 WL 1450565, at *1 (D.C. Cir. Apr. 12, 2012) (per curiam).

## III.  ANALYSIS

Manus points to the failed detail opportunity, Brachman's consistent criticism of her work performance and alleged preference for younger employees, and the performance counseling memorandum, and on the basis of those allegedly adverse employment actions, claims that she was unlawfully retaliated against and was subjected to unlawful age discrimination, both of which forced her to retire. However, this Court's review of the evidence and each of the parties' arguments leads inexorably to a different conclusion: that the Library's motion for summary judgment must be granted in its entirety, because no cognizable adverse action was taken against Manus, nor was she constructively discharged, and with respect to the retaliation claim, Manus also did not engage in any protected activity.

### A.     The Library Did Not Take Any Cognizable Adverse Action Against Manus

As explained above, only a "significant change in employment status" qualifies as an "adverse employment action" in the ADEA context.  *Aliotta*, 614 F.3d at 566 (internal quotation marks and citation omitted).  Indeed, courts have specifically concluded that "formal criticism or poor performance evaluations are not necessarily adverse actions and they should not be considered such if they did not affect the employee's grade or salary."  *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (internal quotation marks, alterations, and citation omitted).  For similar reasons, the denial of a detail assignment is also not an adverse action unless the employee "experiences an adverse change in the terms, conditions, or privileges of employment[.]"  *Evans v. Sebelius*, 191 F. Supp. 3d 4, 8 (D.D.C. 2011) (internal quotation marks and citation omitted).

In the context of details, some courts in this district have drawn a distinction between *vertical* details, which offer clear career-enhancing opportunities, and *lateral* details, which normally have no material impact on the employee.  *Compare Browne v. Donovan*, 12 F. Supp. 3d 145, 155 (D.D.C. 2014) (finding that the denial of a vertical detail, which would have resulted in a temporary promotion with no additional pay, was an adverse employment action) *with Evans*, 191 F. Supp. 3d at 8 (holding that the denial of a lateral transfer that results in no diminution in pay or benefits "constitutes an adverse employment action only where the plaintiff experiences an adverse change in the terms, conditions, or privileges of employment" (internal quotation marks and citation omitted)). But there is no doubt here that Manus was seeking a *lateral* detail,

which—if anything—would have itself led to a *diminution* in Manus's duties and responsibilities.  (Def.'s Exhibit 2E, ECF No. 11-3, at 43 (recognizing how Manus's detail could only likely be for a "lower (GS 11)" role, even though she was a GS-14 level employee).)  And there is no basis whatsoever for Manus's suggestion that Brachman's criticism of her work standing alone, or in conjunction with his alleged preference for younger employees, was sufficiently adverse to alter the terms of conditions of her employment.

To be sure, a materially adverse action in the Title VII retaliation context "encompass[es] a broader sweep of actions than those in a pure discrimination claim," *Baloch*, 550 F.3d at 1198 n.4, because it includes to conduct that "would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination[,]'" *id.* at 1198 (quoting *Burlington*, 548 U.S. at 68).  But it is also well established that "[a] reprimand letter setting forth allegations of deficient work performance is not a materially adverse action [for retaliation purposes] absent a showing that the letter would have dissuaded a reasonable employee from engaging in protected activity."  *Durant v. District of Columbia*, 875 F.3d 685, 698 (D.C. Cir. 2017); *see also Baloch*, 550 F.3d at 1199 (finding that a letter of reprimand containing "job-related constructive criticism" but no "abusive language" was not materially adverse).

Given these standards, it is clear to this Court that the record evidence does not support a reasonable inference that Manus was subjected to an adverse employment action for the purpose of either her ADEA discrimination or Title VII retaliation claim. For example, while the record indicates that Brachman gave Manus negative reviews

and a performance counseling memorandum, there is no evidence of any tangible consequences of getting such a memorandum, in terms of Manus's salary or title.  Nor does the evidence demonstrate that the feedback was so insulting or extraordinary that it would have dissuaded a person in Manus's position from reaching out to the EO office to complain about Brachman's alleged mistreatment.

And the *timing* of Brachman's critical reviews also undermines the conclusion that his actions were undertaken to retaliate against Manus for her contacts with the EEO office.  Instead, the record demonstrates that Brachman's critiques started mounting shortly after he arrived on the job, which was long before Manus contacted the EEO office to complaint about the criticism, and they continued up until Manus's retirement.  *See Salak v. Pruitt*, 277 F. Supp. 3d 11, 22 (D.D.C. 2017) (explaining that, "while causation can sometimes be inferred from a close temporal relationship between the protected activity and the allegedly adverse action in retaliation cases, the *sequence* truly matters" and "there is no evidence whatever of causality if the employer continues to proceed along lines previously contemplated" (internal quotation marks, alterations, and citation omitted)).  The record also fails to demonstrate that Manus ever improved her performance such that any continued criticism from Brachman could reasonably be construed as retaliatory.  *See Crowley v. Perdue*, 318 F. Supp. 3d 277, 295 (D.D.C. 2018) (holding that defendant's decision to keep the plaintiff on a performance improvement plan even after he met all objectives initially set out in that plan was an adverse action).

Ultimately, the conduct that Manus relies upon to support her contention that she was subjected to actionable adverse employment actions—including Brachman's failure

to invite Manus to conferences and panels, or his allegedly more robust contacts with younger employees (*see* Pl.'s Opp'n at 12)—merely amounts to the kind of non-actionable "petty slights or minor annoyances that often take place at work[.]" *Burlington*, 548 U.S. at 68.[4]  And neither Title VII nor the ADEA "set forth a general civility code for the American workplace."  *Howard v. Kerry*, 85 F. Supp. 3d 428, 435 (D.D.C. 2015) (quoting *Burlington*, 548 U.S. at 68); *see also Nichols*, 248 F. Supp. 3d at 9.  Therefore, this Court easily concludes that Manus has failed to offer proof of a substantial change in her employment status or altered conditions that would have discouraged the average worker from engaging in protected conduct.

**B.    The Record Evidence Does Not Support An Inference That Manus Was Constructively Discharged**

To the extent that Manus contends that the adverse employment action at issue with respect to her retaliation and discrimination claims was the loss of her job through constructive discharge—*i.e.*, that Brachman's constant criticisms made her retirement involuntary (*see* Pl.'s Opp'n at 19)—the Court further finds that Manus has failed to establish constructive discharge under either the ADEA or Title VII.

As explained above, a constructive discharge is nothing more than "an aggravated case of . . . hostile work environment," *Suders*, 542 U.S. at 147; therefore, a plaintiff who seeks to establish retaliation or discrimination on this basis must show not only sufficient facts to prove a hostile work environment but also "working conditions so intolerable that a reasonable person would have felt compelled to resign[,]" *id.*  Here,

---

[4] Manus's contention that Brachman's criticisms occasionally involved shaming and berating comments (*see* Manus Affidavit at 6) is not supported by the evidence (*see* Def.'s Ex. 14, ECF No. 11-4, at 55 (containing the text of the e-mails in question)).

Manus asserts that Brachman's performance counseling memorandum rose to this level of intolerable conduct, because it was outside the normal process of a performance evaluation, was formalized and put into her permanent work file, was delivered with a hostile attitude, "required [her] to do about twice as many work assignments as her usual workload," and "was the most negative experience from a supervisor in her entire career[.]" (Pl.'s Opp'n at 19; *see also id.* (contending that, after receiving the memo, Manus "was effectively deprived of free choice in the matter such that [she] had no alternative but to resign").) But these acts by Brachman are neither "extreme" nor "objectively and subjectively offensive," *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998), and this is especially so in light of the benign circumstances in which the performance counseling memo was drafted and presented to Manus. (*See, e.g.*, Def.'s Ex. 20, ECF No. 11-5, at 6 (including an e-mail chain between Human Resources and Brachman, with Human Resources following up about the draft memo, Brachman apologizing for the delay in responding and asking Human Resources if performance counseling was still the right approach, and Human Resources explaining their views on why such a memo would be in Manus's best interest).)

What is more, the record facts fall *far* short of further establishing that it was Manus's allegedly intolerable working environment that was the impetus for her retirement. Indeed, quite to the contrary, the evidence concerning Manus's quest for a detail amply indicates that Manus was interested in leaving her post and retiring even before Brachman became her supervisor. (*See, e.g.*, Def.'s Ex. 25, ECF No. 11-5, at 21; Def.'s Ex. 28, ECF No. 11-5, at 27.) Thus, Manus is hard pressed to say now that it was Brachman's subsequent critique of her work product and his alleged preference for

younger employees that overcame her will to remain such that she had no other choice but to retire.

### C.   Manus Has Not Demonstrated That She Engaged In Any Protected Activity For The Purpose Of Her Title VII Retaliation Claim

Even if the record evidence was sufficient to demonstrate that Manus was subjected to constructive discharge or any other adverse employment action, her Title VII retaliation claim would still fail because there is no factual basis for the contention that Manus engaged in protected activity prior to the negative feedback and other conduct that allegedly forced her to retire.

Title VII's anti-retaliation provision expressly protects two kinds of activity: (1) "participation in EEO proceedings, such as making a charge, testifying, assisting, or otherwise participating in an EEO investigation, proceeding, or hearing," *Grosdidier v. Broad. Bd. of Governors*, 774 F. Supp. 2d 76, 107 (D.D.C. 2011), and (2) opposition to "any practice made an unlawful employment practice" by Title VII, 42 U.S.C. § 2000e–3(a), which includes discrimination based on "race, color, religion, sex, or national origin," *id.* § 2000e-2; *see also Dunbar v. Foxx*, 246 F. Supp. 3d 401, 414 (D.D.C. 2017). Courts in this district have also adopted a third theory of retaliation under Title VII, often referred to as "perception theory," which permits a plaintiff to recover if the "employer punishes the employee based on its *belief* that the employee is engaging in protected activity." *Murphy v. District of Columbia,* 390 F. Supp. 3d 59, 71 (D.D.C. 2019). Manus appears to invoke the participation clause of the Title VII anti-retaliation provision, because her motion stresses her meetings with the EEO office (*see* Pl.'s Opp'n at 15–16) and so does her complaint (*see* Compl. ¶¶ 42–49), but there is no

allegation or evidence that Manus initially sought out the EEO office *to complain about discrimination* prior to any of the alleged adverse actions that she identifies.

Indeed, Manus's contemporaneous notes are quite clear that the purpose of her early and frequent communications with the EEO was to try to arrange a detail with the Music Department.  (*See, e.g.*, Def.'s Ex. 2E, ECF No. 11-3, at 43 (documenting the fact that the EEO office let Manus know, on April 3, 2017, that the office was planning to "talk to Ellis [Brachman] to try and work out [a] swap [detail]" between Manus and a lower-level employee at the Music Division); Def.'s Ex. 35, ECF No. 11-6, at 14 (mentioning that, on April 17, 2017, the EEO office contacted Manus to let her know that "Ellis [Brachman] said OK to go ahead with 'something', for [Manus] to move to [the Music Division]").)  Such activity does not fall under the participation clause of Title VII's anti-retaliation provision, *see* 42 U.S.C. § 2000e–3(a) (protecting employees who "participate[] in any manner in an investigation, proceeding, or hearing under this subchapter"), and there is simply no evidence that, by meeting with the EEO office in March, April, and May of 2017, Manus was exploring or even thinking about the possibility of bringing a discrimination claim against Brachman.

As for the meeting between Manus and the EEO office later on, in September of 2017, Manus once again raised the possibility of a detail assignment, but at this meeting, for the first time, she also told the EEO staff that "she felt . . . she was in a hostile work environment[,]" and she wondered if she could "file . . . an EEO complaint if she retired[.]"  (EEO Staff Deposition at 25; *see also* Def.'s Ex. 41, ECF No. 11-6, at 26 (saying that Manus reported that she was "being set up to fail in [her] job").)  This meeting qualifies as protected activity within the meaning of the participation clause of

Title VII, *see Bell v. Gonzales*, 398 F. Supp. 2d 78, 94 (D.D.C. 2005) (holding that "[i]nitiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination"), but it occurred *after* Manus had received the performance counseling memorandum from Brachman, which is the last allegedly adverse action that Manus identifies prior to her retirement.   Thus, the September 2017 EEO contact cannot be the protected activity that gave rise to Brachman's allegedly unlawful retaliatory act of providing the memorandum to Manus, as a matter of fact or law.  *See Watkins v. Tex. Dep't of Criminal Justice*, 269 F. App'x 457, 461 (5th Cir. 2008) (holding that actions which "predate [the plaintiff's] participation in any protected activity" "cannot be retaliatory" under Title VII).

The "perception theory" of retaliation is also of no help to Manus, because the uncontroverted record testimony makes clear that the EEO office contacted Brachman in April of 2017 to inform him that Manus was interested in obtaining a detail in the Music Division and, in so doing, also specifically stressed that "*this is not an EEO complaint, it's not a grievance, it's not an alternative . . . resolution dispute*[.]" (EEO Staff Deposition at 20 (emphasis added); *see also* Brachman Deposition at 10).)  Manus has alleged that Brachman knew of her meetings with the EEO office (*see* Compl. at ¶¶ 30–31), and has thereby suggested that Brachman perceived her to be making a claim of discrimination to EEO officials, despite the EEO office's disclaimers.  But mere assertions are not enough at the summary judgment state—*evidence* is required.  And there is simply nothing in the record before the Court to support the assertion that Brachman actually believed that Manus had been in communication with the EEO office

to complain about discrimination or to otherwise engage in protected activity. *See Murphy,* 390 F. Supp. 3d at 71.

In short, there is no genuine issue of fact concerning whether any of Manus's meetings with the Library's EEO office qualified as protected activity that could support a viable Title VII retaliation claim: as a matter of law, this Court finds that they cannot. And there is similarly no genuine dispute over whether Brachman acted based upon his *belief* that Manus was engaging in protected activity. Accordingly, and for this reason alone, Manus's Title VII retaliation claim cannot proceed.

## IV.    CONCLUSION

For the foregoing reasons, this Court concludes that Manus cannot proceed to trial with respect to her Title VII retaliation claim or her DEA discrimination claim. Therefore, as set forth in the accompanying Order, the Library's motion for summary judgment will be **GRANTED**.


DATE:  May 23, 2020                              *Ketanji Brown Jackson*
                                                _____
                                                KETANJI BROWN JACKSON
                                                United States District Judge